USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/22/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL WOLFF,

          Plaintiff,

       -against-

MELANIA TRUMP,

         Defendant.

---

1:25-cv-10752-MKV
OPINION & ORDER
GRANTING MOTION TO
DISMISS

MARY KAY VYSKOCIL, United States District Judge:

**PRELIMINARY STATEMENT**

In this case, a chronicler of the First Family sues the First Lady because she threatened to sue him for defamation. While Plaintiff and the First Lady have a real dispute, they must litigate it according to the same procedures as everyone else.

Plaintiff asks for a declaration that, if the First Lady sues him, he deserves to win. That is not how the federal courts work. He also contends that he should not be in federal court at all. But, while it may have started in state court, this case was properly removed. Plaintiff and the First Lady are citizens of different states, and the lawsuit she threatened seeks a billion dollars in damages.

There are many features of this case that make it complicated: the prominence of the personalities involved, the scandalizing content of the underlying statements, and, frankly, an inappropriate level of tactical gamesmanship. But the outcome is simple. The Court will not be conscripted to oversee an abusively presented spat and so declines to reach the merits here.

1

**BACKGROUND**

Plaintiff initiated this action against the First Lady of the United States (the "First Lady") in state court. *See* [ECF No 1-1] (the "Complaint" or "Compl.").[1] The Complaint concerns a demand letter sent by the First Lady, through counsel, to Plaintiff. Compl. at 3, ¶ 1; *see also* [ECF No. 1-1] at 19 (the "Demand Letter"). The Demand Letter "was made pursuant to Florida Statute 770.01[,] a legal requirement for commencing a libel action." Compl. at 4, ¶ 3. It identified as defamatory certain statements that Plaintiff had publicly made regarding the First Lady, and insisted that he retract and apologize for them. Compl. at 3, ¶ 1. It further indicated that, if Plaintiff failed to comply by October 21, 2025, at 5:00 PM EST, the First Lady would commence legal action against him seeking one billion dollars in damages. Compl. at 3, ¶ 2. Plaintiff filed his Complaint on October 21, 2025, presumably hoping to preempt the threat of litigation in the Demand Letter.

In the Complaint, Plaintiff seeks the following relief: 1) a declaration that the challenged statements are not actionable libel claims; 2) a declaration that "if [the First Lady] continues or advances her claims" she will be liable for costs, fees, and compensatory and punitive damages under N.Y. Civ. Rights Law ("NYCRL") §§ 70-A, 76-A (New York's "anti-SLAPP" law); and 3) an award of costs, fees, damages, and any other and further appropriate relief. Compl. at 16–17.

The First Lady removed the action to federal court, [ECF No. 1] (the "Notice of Removal" or "NoR"), at which point it was assigned to me. Thereafter, she moved to dismiss the Complaint, or, in the alternative, to have it transferred to the Southern District of Florida. [ECF No. 8].

The First Lady presented the following bases for dismissal: lack of personal jurisdiction, insufficient service of process, and failure to state a claim, pursuant to Federal Rules of Civil

---

[1] Because of a defect in the Complaint's paragraph numbering, the Court cites throughout to both the paragraph number and the ECF-stamped page number upon which that paragraph appears.

Procedure 12(b)(2), (5), and (6), respectively. [ECF No. 9] (the "Motion to Dismiss or Transfer" or "MTD") at 1. Counsel for the First Lady submitted a supporting declaration, [ECF No. 10] (the "Schechtman Declaration" or "Schechtman Decl."), accompanied by exhibits, [ECF Nos. 10-1–3] (the "Schechtman Exhibits" or "Schechtman Exs.").

Plaintiff opposed. [ECF No. 13]. In so doing, he cross-moved to remand the case to state court, or, in the alternative, for jurisdictional discovery. *Id.* He also purported to seek the following forms of relief, here abbreviated to conserve space: 1) "[t]aking up Wolff's Motion made in New York Supreme" regarding alternative service, 2) a "[r]uling that for purposes of resolving the issue of [the First Lady's] true citizenship, no further service of process is required," 3) "[g]iving priority to the question of Subject Matter Jurisdiction," 4) an order striking the Motion to Dismiss or Transfer, and 8) any "other and further relief" the Court might find "just and proper." *Id.* at 1–2 (cleaned up). In support of his chimerical opposition motion, Plaintiff filed a memorandum of law, [ECF No. 14] (the "Opposition" or the "Opp."), and declaration of counsel, [ECF No. 15] (the "Korzenik Declaration" or "Korzenik Decl."), accompanied by exhibits, [ECF No. 15-1–3] (the "Korzenik Exhibits" or "Korzenik Exs.").

The First Lady filed a reply in support of the Motion to Dismiss or Transfer, and in opposition to the miscellaneous relief sought by Plaintiff. [ECF No. 18] (the "Reply").

Thereafter, Plaintiff sought, but did not receive, permission to file a sur-reply. [ECF No. 19]; *see also* [ECF No. 20] (opposing Plaintiff's request); Individual Rule 4.A.iii. ("Sur-reply memoranda will not be accepted without prior permission of the Court."). When Plaintiff filed his brief anyway, [ECF No. 22] (the "Sur-Reply"), the Parties bickered over the degree to which the Court should consider it. *See* [ECF Nos. 23, 24]. Because it could be charitably construed as a

reply brief concerning remand and the other affirmative relief sought in Plaintiff's Opposition, the Court has considered the Sur-Reply. [2]

Before proceeding, the Court must decide whether or not it has jurisdiction to adjudicate the subject matter of this dispute. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998) (Subject matter jurisdiction is a "threshold question that must be resolved . . . before proceeding to the merits."). This case presents two possible defects in the Court's subject-matter jurisdiction: lack of diversity between the Parties, and lack of a justiciable case or controversy.

The Court determines that it does have jurisdiction over the subject matter of this action. The Parties are citizens of different states, and the dispute between them involves a live case or controversy. But the case is better adjudicated elsewhere, in a different and more traditional posture. Though procedurally contorted almost beyond recognition, and though it involves well-known personalities, this is a garden-variety dispute over alleged defamation. That is how it should be litigated.

First, Plaintiff argues that the Court lacks the statutory authority to hear a case between these two Parties. Because his Complaint does not present a question of federal law, the Court may not hear the case unless the Parties are citizens of different states and the amount in controversy is worth more than $75,000. *See* 28 U.S. Code § 1332. Plaintiff is a citizen of New York, and argues that the First Lady is, too—notwithstanding her assertion of Florida citizenship. He characterizes her allegations of residing, voting, and holding a driver's license in Florida as a sham. The Court disagrees, and finds that the First Lady has shouldered her burden to establish Florida citizenship. Plaintiff's flailing arguments to the contrary do not raise a doubt sufficient to

---

[2] That said, Plaintiff's devil-may-care attitude towards the rules of procedure governing litigation in the federal courts, generally, and before this Court, specifically, is inappropriate and does not serve him well.

warrant remand to state court. The Court likewise finds that the amount in controversy requirement is easily satisfied.

Second, the First Lady argues that Plaintiff's request for a judicial pronouncement concerning his potential liability for past torts is an abuse of the declaratory judgment mechanism. If this is so, Plaintiff responds, then his Complaint does not present the kind of case or controversy that the Constitution allows a federal court to decide. Although both Parties miss the point— Plaintiff harps on the irrelevant suggestion that New York procedural law might be more capacious than its federal counterpart, while the First Lady mistakenly insists that the real issue is substantive—remand would indeed be required if that were the case. But it is not. As noted, this is at bottom an ordinary dispute over alleged speech-torts. The federal courts routinely adjudicate such disputes.

Nevertheless, because Plaintiff has presented the dispute here as a request for declaratory judgment, the Court is not bound to decide it. Whether or not to entertain a declaratory judgment action is a matter of discretion left to the Court. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) ("Since its inception, [Title 28, United States Code, Section 2201 (the "Declaratory Judgment Act")] has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."). The Court declines to entertain this one. To do otherwise would be to reward Plaintiff for his gamesmanship, perverting the process by which speech-tort claims are ordinarily resolved. If and when the First Lady sues Plaintiff for defamation, he may raise his defenses and counterclaims in that suit. Indeed, by his own telling, she has already sued him in Florida, under Florida law. He may not short-circuit that process by preemptively litigating his defenses and counterclaims here, under New York law.

**STANDARD**

Rule 12(b)(1) requires that a claim be dismissed for lack of subject matter jurisdiction "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The Constitution, as relevant here, requires the existence of a case or controversy between the Parties. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) ("[T]he phrase 'case of actual controversy' in the [Declaratory Judgment] Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III."). Likewise, by statute, the Court has jurisdiction over such a case or controversy—where, as here, it does not present a question of federal law—only if there is complete diversity of citizenship between the Parties and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332.

Furthermore, a party seeking a declaratory judgment is not absolutely entitled to declaratory relief. Instead, the Declaratory Judgment Act "vests a district court with discretion to determine whether it will exert jurisdiction over a proposed declaratory action or not." *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). To that end, the Supreme Court has counselled that courts may abstain in declaratory judgment actions, as "the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton*, 515 U.S. at 288 (interpreting *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491 (1942)). A district court may not abstain, however, where "a plaintiff does not seek purely declaratory relief, but also seeks damages caused by the defendant's conduct," *Kanciper v. Suffolk Cty. SPCA, Inc.*, 722 F.3d 88, 93 (2d Cir. 2013) (cleaned

6

up), or calls for resolution of "novel questions of federal law," *Youell v. Exxon Corp.*, 74 F.3d 373, 376 (2d Cir. 1996).

### ANALYSIS

This case is presented to the Court in a somewhat contorted posture: A would-be defamation defendant sues a would-be defamation plaintiff in New York state court. He seeks a declaration that statements identified in a demand letter threatening litigation under Florida law are not defamatory, and, further, that any such litigation would violate—or, perhaps, has violated already—New York's anti-SLAPP law. Thereafter, the would-be defamation plaintiff removes the action to federal court, and moves to dismiss.

On the merits, the basic issue here is whether Plaintiff's public statements about the First Lady were defamatory. But that question, however much attention it may have received in the media, is not yet before the Court. Instead, the Court must first decide whether it can hear this case at all. The Court must next evaluate whether it would be a wise and economical exercise of the judicial power to do so. These are "threshold grounds for denying audience to [this] case on the merits," so the Court is at no risk of "overstep[ping] Article III limits" in considering them. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999).

Chief among these threshold issues are those that implicate the Court's ability to decide the subject matter of this case. "The district courts of the United States . . . are courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005) (quotation omitted).

Federal district courts are empowered by statute to hear cases that present a question of federal law or that concern a dispute worth more than $75,000 between parties of diverse citizenship. *See id.* (citing 28 U.S.C. §§ 1331; 1332). Because this case involves only claims

brought under state law, the first threshold issue turns on the existence of diversity jurisdiction. *See* 28 U.S.C. § 1332; *Ruhrgas*, 526 U.S. at 584 ("[L]ack of complete diversity . . . rests on statutory interpretation, not constitutional command.").

The second threshold question is constitutional, and turns on the existence of a case or controversy under Article III. *See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239 (1937) (Article III of the "[t]he Constitution . . . limits the exercise of the judicial power to 'cases' and 'controversies.'"); *MedImmune*, 549 U.S. at 127 (2007) ("[T]he phrase 'case of actual controversy' in the [Declaratory Judgment] Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III."). Relatedly, even if the Court may hear this case, it need not do so if adjudication would be imprudent, because the relief Plaintiff seeks is declaratory in nature. *See Dow Jones*, 346 F.3d at 359.

Accordingly, the Court considers in turn the following issues: the existence of diversity jurisdiction; the existence of a case or controversy under the Declaratory Judgment Act; and, relatedly, whether prudential interests militate in favor of abstaining from deciding the merits.

Since these issues control the disposition of this case at this stage, the Court declines the First Lady's invitation to first assess the existence of personal jurisdiction over her in New York. *See* Reply at 7 (quoting *United States ex rel. Hanks v. United States*, 961 F.3d 131, 137 (2d Cir. 2020)). The subject-matter jurisdictional inquiry here does not involve the sort of " 'difficult and novel' challenge," *Hanks*, 961 F.3d at 137 (quoting *Ruhrgas*, 526 U.S. at 588), that would justify deviating from the "[c]ustom[]" of the federal courts to "first resolve[] doubts about . . . jurisdiction over the subject matter" of cases brought before them. *Ruhrgas*, 526 U.S. at 578.

The Court is left with no doubt regarding the existence of diversity jurisdiction. The way Plaintiff initiated this suit does give rise to doubts about the existence of a case or controversy. In

8

the end, the Court finds that those doubts do not vitiate its jurisdiction. They do, however, counsel in favor of abstention. Since the Court reaches that conclusion in the course of it inquiry into the existence of subject matter jurisdiction, it finds no need or occasion to address the First Lady's contention that the Court is unable to exercise jurisdiction over her person. *See* MTD at 6–11. The same is true for her request, in the alternative, that this case be transferred to the Southern District of Florida. *See id.* at 15–17.

## I.     Diversity Jurisdiction

Plaintiff first questioned the existence of diversity jurisdiction in this case by way of a procedurally inapposite letter motion filed shortly after the First Lady indicated her intent to move for dismissal or transfer of the Complaint.  *See* [ECF Nos. 4, 6].  The Court assured itself preliminarily of the existence of subject matter jurisdiction, while recognizing that Plaintiff was "free to . . . move [for remand] at any time, consistent with" procedural law applicable in the federal courts.  [ECF No. 7] at 1–2 (citing NoR at 4–5).

Plaintiff has now so moved, and submitted what he purports to be evidence in support of that motion. *See* Korzenik Decl.  His moving papers are as procedurally chaotic as they are legally confused.  Nevertheless, because it must, the Court again inquires into the existence of its jurisdiction to hear the subject matter of this case.

Generally, a defendant may remove from state to federal court any case over which the federal court has original jurisdiction. *See* 28 U.S.C. § 1441(a).  "It is well-settled that the party asserting federal jurisdiction bears the burden of establishing jurisdiction." *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 57 (2d Cir. 2006) (citation omitted).  In removal cases, this is the defendant. *California Pub. Employees' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 100 (2d Cir. 2004).

Where, as here, subject matter jurisdiction is premised upon diversity jurisdiction, *see* NoR ¶ 10, the removing defendant must establish that the action is between "citizens of different States." 28 U.S.C. § 1332(a)(1).  She also must establish that "the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs."  28 U.S.C. § 1332(a).  "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  28 U.S.C. § 1447(c).

"On a motion to remand for lack of subject matter jurisdiction, courts assume the truth of non-jurisdictional facts alleged in the complaint, but may consider materials outside of the complaint, such as documents attached to a notice of removal or a motion to remand that convey information essential to the court's jurisdictional analysis."  *Guzman v. First Chinese Presbyterian Cmty. Affs. Home Attendant Corp.*, 520 F. Supp. 3d 353, 356 (S.D.N.Y. 2021) (citing  *Romero v. DHL Express (U.S.A), Inc.*, No. 15-cv-4844 (JGK), 2016 WL 6584484, at *1 (S.D.N.Y. Nov. 7, 2016), *aff'd sub nom. Romero v. DHL Express (USA), Inc.*, 719 F. App'x 80 (2d Cir. 2018)); *see also Makarova*, 201 F.3d at 113 ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings.").

More specifically, "[i]f the [party contesting jurisdiction] challenges only the legal sufficiency of the . . . jurisdictional allegations, the court must take" the allegations "as true and draw all reasonable inferences in favor of" the party asserting jurisdiction, whereas, if "evidence relevant to the jurisdictional question is before the court, the district court may refer to that evidence."  *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) (cleaned up, quotations and citations omitted).  Indeed, the Court "must do so if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction."  *Id.* at 141 n.6.  Nevertheless, even where a party attacking the Court's jurisdiction proffers evidence, the party invoking

10

jurisdiction is still "entitled to rely on . . . allegations" to the extent that the proffered evidence does not engender a legally material dispute. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016).

Finally, "out of respect for the limited jurisdiction of the federal courts and the rights of states, we must resolve any doubts against removability." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007); *see also Bellido-Sullivan v. Am. Int'l Grp., Inc.*, 123 F. Supp. 2d 161, 163 (S.D.N.Y. 2000) ("[T]he party seeking remand is presumed to be entitled to it unless the removing party can demonstrate otherwise.").

### a.  Citizenship

"An individual's citizenship, within the meaning of the diversity statute, is determined by [her] domicile; in other words, the place where [she] has [her] true fixed home and principal establishment, and to which, whenever [she] is absent, [she] has the intention of returning." *Van Buskirk v. United Grp. of Companies, Inc.*, 935 F.3d 49, 53 (2d Cir. 2019) (cleaned up, quoting *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 42 (2d Cir. 2000)).  The First Lady must shoulder the burden of establishing her citizenship outside of New York "because [she] removed this case to the district court on the basis of diversity jurisdiction." *Gilman v BHC Securities, Inc.*, 104 F.3d 1418, 1421 (2d Cir. 1997).

In seeking remand for lack of diversity jurisdiction, Plaintiff argues that—like him—the First Lady is a citizen of New York.  Specifically, he argues that "since she moved to the United States in the late 1990's and later became a citizen," she has always been a New Yorker.  Opp. at 2.  The First Lady, however, asserts that she is "domiciled in, and is therefore a citizen of, the State of Florida." *See* NoR at ¶ 13.  She alleges that, "since October 2019," her "primary residence has been Mar-a-Lago in Palm Beach, Florida, . . . [where] she spends her time . . . while not on official

11

duties," and that she "is registered to vote [in Florida], has voted there in every federal election since 2020, and has maintained a Florida driver's license since 2021." Reply at 10 (citing NoR at ¶¶ 13(a)–(d)).

While Plaintiff recognizes that the First Lady "has ties to Florida," Compl. at 6, ¶ 2, he nevertheless insists that her "claim to [Florida] citizenship is an artifice." Opp. at 5. Plaintiff makes three related arguments in support of his assertion that the First Lady is not domiciled where she says she is. His first argument is that "[t]o rely, as [the First Lady] has, on nothing more than a claim of possession of a driver's license and a voter registration and other merely conclusory pronouncements – coyly referenced in a memo of law - demonstrates nothing more than 'residence.'" Sur-Reply at 1. His second argument is that the First Lady's decision to rely upon the jurisdictional allegations in her Notice of Removal, rather than submitting affidavits or other evidence, "is nothing less than a default, a proof failure." *Id.* at 2. Finally, he argues that, to the extent that the First Lady is asserting a changed domicile, she has not met her heightened burden to establish that change by "clear and convincing evidence." Opp. at 4 (quoting *Lawrence Moskowitz CLU Ltd v. ALP, Inc.*, No. 19-cv-3868 (ER), 2020 WL 1503558, *3-4 (S.D.N.Y. 2020), *aff'd*, 830 F. App'x 50 (2nd Cir. 2020)).

The Court is unpersuaded by these arguments. The First Lady's allegations—that she is domiciled in Florida, where she has her primary residence, spends most of her time, votes in federal elections, and maintains her driver's license, *see* NoR ¶ 13—suffice to carry her burden of establishing Florida citizenship. The Court has no reason to doubt these allegations, let alone to credit Plaintiff's scurrilous characterization of them as a sham, *see* Opp. at 5. Instead, the Court "assume[s] that [the First Lady's counsel], . . . experienced lawyer[s], [are] familiar with Rule 11 and the penalties to which [counsel], and perhaps [counsels'] client as well, would be exposed if

[counsel] did not follow the Rule's dictates.  [The Court] also assume[s] that [counsel], as [the First Lady's] legal spokes[people], [are] better qualified than anyone else to speak with authority concerning [her] domiciliary status . . . ."  *Gutierrez v. Fox*, 141 F.3d 425, 427 (2d Cir. 1998). Nevertheless, the Court addresses each of Plaintiff's arguments in turn.

First, Plaintiff is wrong to assert that "the Driver's License and Voter Registration establish nothing."  Opp. at 6 (emphasis omitted).  It is true that "allegations of residency alone cannot establish citizenship."  *Forte v. BNP Paribas*, No. 14-cv-8556 (JPO), 2015 WL 3604317, at *5 (S.D.N.Y. June 8, 2015) (quoting *Canedy v. Liberty Mut. Ins. Co.*, 126 F.3d 100, 102–03 (2d. Cir. 1997)).  Obviously, "a statement of residence, unlike domicile, tells the court only where the parties are living and not of which state they are citizens."  *Raymond v. Dias de Araujo*, No. 23-cv-07578 (PMH), 2023 WL 8947157, at *2 (S.D.N.Y. Dec. 28, 2023) (quoting *Adrian Fam. Partners I, L.P. v. ExxonMobil Corp.*, 79 F. App'x 489, 491 (2d Cir. 2003)); *see also Van Buskirk*, 935 F.3d at 54 ("Here, Plaintiffs alleged in their complaint that they were residents of Cobleskill, New York.  As a threshold matter, residence alone is insufficient to establish domicile for jurisdictional purposes.").  This is because, "[a]lthough a person may have multiple residences, he can have only one domicile."  *Forte*, 2015 WL 3604317, at *5 (citing *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989); *Rosario v. INS*, 962 F.2d 220, 224 (2d Cir.1992)).

But the First Lady has alleged more than mere residence; she has alleged citizenship.  *See* NoR ¶ 13 ("Mrs. Trump is domiciled in, and is therefore a citizen of, the State of Florida[.]"); NoR ¶ 14 ("Based on these established and indisputable facts, Mrs. Trump is a citizen of Florida.").  And she has supported her allegations of citizenship with subsidiary allegations, *see* NoR ¶¶ 13(a)–(d), that serve as "objective indicia," rather than mere say-so, "of actual residence and intent" to remain.  *Nat'l Artists Mgmt. Co. v. Weaving*, 769 F. Supp. 1224, 1227–1228 (S.D.N.Y. 1991)

("Where . . . there is evidence indicating the party has more than one residence, or the residence is unclear, the court should focus on the intent of the party. . . . Among the influential factors are the place where civil and political rights are exercised, taxes paid, real and personal property (such as furniture and automobiles) located, driver's and other licenses obtained, bank accounts maintained, location of club and church membership and places of business or employment." (quotation omitted)).

This is more than what was necessary to make a *prima facie* showing of Florida citizenship. *See Bogan v. Nw. Mut. Life Ins. Co.*, 103 F. Supp. 2d 698, 700–01 (S.D.N.Y. 2000) ("As an initial matter, when the place of actual residence is clear, it is typically unnecessary for the Court to inquire as to a party's intent to remain in the new state," because "[a]n individual's residence at the time a lawsuit is commenced provides *prima facie* evidence of his domicile." (quoting *Willis v. Westin Hotel Co.*, 651 F. Supp. 598, 601 (S.D.N.Y. 1986)).

Second, the First Lady would be required to "support [her jurisdictional] allegations with 'competent proof'" only if Plaintiff "properly challenge[d]" them "or if the Court *sua sponte*" directed her to do so. *Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998) (quoting *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). While Plaintiff has submitted a thirteen-page declaration, *see* Korzenik Decl., attaching three exhibits, *see* Korzenik Exs., he has nevertheless failed to mount a proper challenge to the First Lady's allegations of Florida citizenship. *See Khodeir v. Sayyed*, No. 15-cv-8763 (DAB), 2016 WL 5817003, at *3 n.3 (S.D.N.Y. Sept. 28, 2016) ("Although a court may refer to evidence outside of the pleadings, such as affidavits in resolving disputed jurisdictional fact issues when deciding a Rule 12(b)(1) motion to dismiss, the Court declines to consider [defendant's] Affidavit in Support of his 12(b)(1) Motion to Dismiss here." (quotations and citation omitted)).

14

The Korzenik Declaration is sworn and submitted by Plaintiff's own lawyer on an unspecified admixture of "personal knowledge or . . . information and belief." Korzenik Decl. at 1. This, alone, is enough reason to "disregard[]" the whole thing. *See Neewra, Inc. v. Manakh Al Khaleej Gen. Trading & Contracting Co.*, No. 03-cv-2936 (MBM), 2004 WL 1620874, at *2 n.3 (S.D.N.Y. July 20, 2004) ("To the extent that [plaintiff's attorney's] declaration asserts facts that are not based on [his] personal knowledge, this declaration will be disregarded.").

Reading further merely confirms the soundness of that conclusion: About the First Lady's domestic life, Plaintiff and his counsel know nothing. The Korzenik Declaration is peppered with trivial details that Plaintiff's counsel apparently observed while watching "the 'Melania' documentary" and scrutinizing "the public behavior of the Trumps." Korzenik Decl. ¶ 25. This kind of parasocial people-watching provides grist suitable at most for the salacious speculation of tabloid headlines. *See, e.g.,* Korzenik Decl. ¶ 24 ("The normal and expected reaction of any spouse to such egregious disloyalty, would be to distance themselves significantly from their disloyal partner; and come to terms with them on a more remote practical basis."). But it is no substitute for cognizable facts or competent evidence.

And the lack of such facts here is palpable in the absence of meaningful supporting citations. *See* Korzenik Decl. ¶¶ 5, 7, 10, 11, 12, 13, 14, 15, 17.b. – d., 17.h., 17.i, 17.j., 17.k., 21, 22, 27, 28. Indeed, Plaintiff's counsel appears sensitive to this deficiency. At points, he cites to documents that he obviously does not possess, like the "Pre-Nuptial; 2017 and revised 2023 [sic]" purportedly executed by the First Lady and her husband, Korzenik Decl. ¶ 23, and, generally, various materials that "can be further canvassed if any discovery should even be needed," Korzenik Decl. ¶ 17.l. On still thinner ice, Plaintiff's counsel resorts to specious mischaracterization of the extremely limited record he has actually put before the Court. Korzenik Decl. ¶ 6 (citing to

Korzenik Ex. A for the proposition that an LLC is active and authorized in Manhattan, but offering no support for the proposition that the First Lady "owns [an] apartment [in Trump Tower] through" that LLC); Korzenik Decl. ¶ 9 (falsely claiming that Schechtman Ex. 3 indicates that "[t]he doorman at Trump Tower confirmed to the process server that Mrs. Trump did indeed live there").

No matter how much "recent reporting . . . corroborates [Plaintiff's contention] on [the First Lady's] citizenship and warrants further examination," Korzenik Decl. ¶ 28 (cleaned up), it is completely immaterial that "Barron Trump is . . . believed to have his own apartment in Trump Tower," ¶ 10 (emphasis omitted), that the First Lady "does not drive or need to," Korzenik Decl. ¶ 27, and that she has colloquially referred to New York City as her "home," or "hometown," Korzenik Decl. ¶ 18.  Nor does the random sampling of three documents from the so-called "Epstein files," divorced from any context and dating back to the turn of the century, have any bearing whatsoever on the citizenship inquiry.  *See* Korzenik Ex. B.

To the extent that the Korzenik Declaration ever emerges from this morass of grasping and scurrilous frivolity, it does so only to advance legal arguments already made in Plaintiff's briefing. *See, e.g.*, Korzenik Decl. at 2 (citing "Memorandum of Law").  This does not help.  *Khodeir*, 2016 WL 5817003, at *3 n.3 ("[Defendant's] Affidavit does not set forth facts that dispute jurisdiction; rather, it makes legal arguments about the jurisdictional basis of Plaintiffs' claims.").

Plaintiff's counsel is not able to manufacture a dispute of fact at the threshold of this case through a document as flimsy, flawed, and unreliable as the Korzenik Declaration.  *See Id.*; *Neewra*, 2004 WL 1620874, at *2 n.3.  Because there is no factual dispute, the First Lady's burden to establish jurisdiction may be satisfied by allegations alone.  *Cf. Linardos*, 157 F.3d at 947; *Robinson*, 269 F.3d at 140; *Carter*, LLC, 822 F.3d at 56.

16

Naturally, the Court recognizes that, should it find the jurisdictional allegations "deficient," *Forte*, 2015 WL 3604317, at \*5, it could also demand evidence, either via a targeted order to show cause or through broader jurisdictional discovery. *See, e.g.*, *Platinum-Montaur Life Scis., LLC v. Navidea Biopharmaceuticals, Inc.*, 943 F.3d 613, 617–18 (2d Cir. 2019) (where "the notice of removal and underlying pleadings do not establish whether complete diversity exists between the parties" the Court may, "with caution," "order jurisdictional discovery"); *Van Buskirk*, 935 F.3d at 54 ("To invoke federal diversity jurisdiction, in response to the district court's order to show cause, Plaintiffs needed to produce evidence establishing that they had been domiciled in Florida at the time they filed their suit." (emphasis omitted)); *Forte*, 2015 WL 3604317, at \*6 ("Because the Amended Complaint fails to allege the citizenship of the parties, . . . [t]he parties shall . . . submit affidavits stating their citizenship as that citizenship is defined under 28 U.S.C. § 1332."); *Linardos*, 157 F.3d at 947.

Here, however, no "evidence" is required to enable the Court to undertake the jurisdictional inquiry, *Moskowitz*, 2020 WL 1503558, at \*4, because the First Lady's allegations are more than sufficient. The Court also notes that Plaintiff has already evinced a clear intent to litigate whatever dimensions of this case he feels like litigating at whatever stage, and in whatever fora, he feels like litigating them.[3] *See, e.g.*, Korzenik Decl. ¶ 2 ("This declaration sets out some of [the First Lady's] substantial contacts, activities and ties to New York that have been continuous, systematic and central to her life since she arrived in New York on a Bl/B2 Visa on August 27, 1996. Some of [these are] based on public records, some on news reports and statements made publicly by [the First Lady], some in recent email releases from the Epstein Files, along with others

---

[3] Moreover, Plaintiff is litigating this case against the First Lady of the United States without even having served her, despite having initiated this action many months ago. *See* Compl. (reflecting an initial filing date of October 21, 2025); Reply at 1 (noting that "Plaintiff offers no justification for his improper, failed attempts to serve [the First Lady] through a doorman at Trump Tower and her Florida counsel.").

17

from other sources and on information and belief."); MTD at 3 n.2 (collecting "paid content and posts on social media" by Plaintiff regarding this case). None of this is competent evidence sufficient to disturb the First Lady's jurisdictional allegations and create an issue of fact.

Because the Court is "not inclined to countenance prolonged preliminary litigation" of whatever issues Plaintiff feels like publicizing under the guise of "the removal issue," *Lupo v. Human Affairs Intern.*, 28 F.3d 269, 274 (2d Cir. 1994), the Court declines to authorize jurisdictional discovery or compel supplemental submissions. The record is clear, and requires no "supplement[]," *Forte*, 2015 WL 3604317, at *6, to support the exercise of diversity jurisdiction.

Finally, the Court does note the somewhat unremarkable claim that the First Lady was at some point in the past domiciled in New York. *See* Opp. at 4 ("In prior litigation against *The Daily Mail* in 2017 that Mrs. Trump brought in New York state civil supreme court, . . . she asserted that her citizenship was 'New York.'" (citing *Melania Trump v. Mail Media, Inc.*, No. 650661/2017 (N.Y. Sup. Ct. N.Y. Cnty. Feb. 6, 2017) ("*Mail Media*")); Complaint ¶ 7, *Mail Media* ("Plaintiff is an individual domiciled in New York, New York, residing at 725 Fifth Avenue."); *Bhatti v. Pettigrew*, No. 11-cv-1044 (JPO), 2012 WL 1107650, at *4 (S.D.N.Y. Apr. 3, 2012) (noting that a party may be "estopped from arguing that [she is] domiciled in [one place] when [she has] maintained in another proceeding that [she is] a citizen of [another]" (citing *Kubin v. Miller*, 801 F.Supp. 1101 (S.D.N.Y.1992)).

This does not, however, contradict her present jurisdictional allegations. *See* Notice of Removal ¶¶ 13(a)–(c) (alleging that the First Lady has designated her primary residence as Mar-a-Lago, and been registered to vote in Florida, since October 30, 2019, and maintained a Florida driver's license since September 2021). Instead, at most, it means that the First Lady must "demonstrate[e] . . . [a] change" in domicile. *Weaving*, 769 F. Supp. at 1227 ("Once domicile is

established in one state, it is presumed to continue in existence, even if the party leaves that state, until the adoption of a new domicile is proven." (cleaned up, quoting *Bevilaqua v. Bernstein*, 642 F. Supp. 1072, 1073 (S.D.N.Y. 1986) (citing *Desmare v. United States*, 93 U.S. (3 Otto) 605, 610 (1876)))).

> To demonstrate a change in domicile, the party with the burden to do so must establish
>
> First, residence in a new domicil; and, second, the intention to remain there.  The change cannot be made except *facto et animo*.  Both are alike necessary.  Either without the other is insufficient.  Mere absence from a fixed home, however long continued, cannot work the change.

*Gutierrez*, 141 F.3d at 428 (quoting *Sun Printing & Publishing Ass'n v. Edwards*, 194 U.S. 377, 383 (1904)).

This is not a unique standard.  It is the "same [one that] applies every time a person establishes a domicile," virtually from the time she is "born." *Weaving*, 769 F. Supp. at 1228.

The point is merely that the burden is on the First Lady, as the party seeking to establish a new domicile. *See Gutierrez*, 141 F.3d at 428 ("As a corollary to [the] presumption" that a domicile continues in one place unless and until a change is established, "the person alleging a change of domicile has the burden of proving it.").  Because this is not a case in "which the allegation of diversity relies on old domiciles and the denial of diversity relies on changes in domicile," *Herrick Co. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 323 (2d Cir. 2001), that was already obvious.  And, as discussed above, the First Lady has more than adequately shouldered her burden by alleging facts sufficient to establish her residence and intent to remain in Florida.

Of course, the Court may look beyond the allegations on a motion to dismiss for lack of subject matter jurisdiction, *see Makarova*, 201 F.3d at 113, and, "if a party opposing jurisdiction properly challenges those allegations," the burden on the party seeking to avail itself of federal jurisdiction becomes an evidentiary one. *Linardos*, 157 F.3d at 947.  But the presumption against

19

changed domicile, *see Gutierrez*, 141 F.3d at 427, and the corollary that the party asserting such a change must prove it by clear and convincing evidence, *see Palazzo*, 232 F.3d at 42, do not themselves generate a factual dispute requiring evidentiary submissions.

Aside from the ultimate allegation of domicile, Plaintiff here does not, for all his blustering, even purport to contest the truth of the First Lady's jurisdictional allegations, as opposed to their legal significance. *See* Sur-Reply at 1 ("To rely, as [the First Lady] has, on nothing more than a claim of possession of a driver's license and a voter registration and other merely conclusory pronouncements – coyly referenced in a memo of law - demonstrates nothing more than 'residence.' Beyond that, [the First Lady] has shown nothing."). Whether or not bolstered by a finger pointed at a prior domicile, this constitutes a facial challenge—not one in response to which the Court is required to preside over a fact-finding expedition. *See Robinson*, 269 F.3d at 140 ("If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." (cleaned up, quotations and citations omitted)); *Carter*, LLC, 822 F.3d at 56 ("When the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it . . . , the plaintiff has no evidentiary burden."); *Amendola v. Cavallero*, No. 23-cv-10607 (KMK), 2025 WL 81383, at *5 (S.D.N.Y. Jan. 13, 2025) (recognizing, in a case where both sides had presented competent evidence concerning domicile, that, unless a party contesting the existence of diversity jurisdiction has "proffered evidence outside the pleadings, requiring [the party asserting the existence of jurisdiction] to proffer controverting evidence," "the plaintiff has no evidentiary burden" (citing *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017), and quoting *Carter*, 822 F.3d at 56)).

20

To hold otherwise would be to endorse the principle that, for example, merely by pointing out that the First Lady was born in Slovenia, a plaintiff could force her to submit extensive evidence concerning the otherwise-undisputed issue of the current "center of [her] domestic, social and civil life," *Weaving*, 769 F. Supp. at 1227, or be deprived of her "plain entitlement to a federal forum," *cf. CBS Inc. v. Snyder*, 762 F. Supp. 71, 74 (S.D.N.Y. 1991) (discussing amendment, under Title 28, United States Code, Section 1653, of *pro forma* defects in allegations supporting removal.).  Far from serving the "need, in a mobile society, 'to fix domicile with some reasonable certainty at the threshold of litigation,'" such a result would "complicate and confuse judicial efforts to ascertain diversity jurisdiction, by engaging the parties and the court in an uncertain effort to determine an unclear departure from an unknown beginning."  *Herrick*, 251 F.3d at 324 (quoting *Gutierrez*, 141 F.3d at 427 n.1)).

### b.  Amount in Controversy

Plaintiff also argues that the Court lacks jurisdiction to hear this case because the minimum amount in controversy has not been "shown, plead [sic] or established."  Opp. at 10.  The Court has diversity jurisdiction only if "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."  28 U.S.C. § 1332.  Plaintiff duplicitously argues that, because this action "is . . . one to protect his free speech rights," his own claims are "too 'speculative' for any 'amount in controversy' valuation."  Opp. at 12 (quoting *Moore v. Betit,* 511 F. 2d 1004, 1006 (2d Cir. 1975)).[4]  As the First Lady points out, however, Plaintiff seeks by this lawsuit to avoid a potential billion-dollar liability.  Reply at 9 (citing Compl. 3, ¶ 2).  Plaintiff insists that this

---

[4] Plaintiff makes the same argument with respect to both his action for declaratory relief, Opp. at 10, and for "potential monetary" damages, Opp. at 12.

argument "is from the wrong POV [sic]," and that "the AIC [sic] is based not on the value of [the First Lady's] claims . . . , but on the value of [Plaintiff's] claims." Sur-Reply at 2–4.

"In a removed case, 'the party invoking federal jurisdiction has the burden of proving that it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount." *Rhythm of Life Corp. v. Hartford Fin. Servs. Grp. Inc.*, 522 F. Supp. 3d 4, 6 (S.D.N.Y. 2021) (cleaned up, quoting *Gilman*, 104 F.3d at 1421). To shoulder this burden, the "notice of removal 'need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold,' and 'need not contain evidentiary submissions.'" *Rhythm of Life*, 522 F. Supp. 3d at 7 (quoting *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84, 89 (2014)).

"In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977). This "is calculated from the plaintiff's standpoint; the value of the suit's intended benefit or the value of the right being protected or the injury being averted constitutes the amount in controversy when damages are not requested." *Kheel v. Port of New York Auth.*, 457 F.2d 46, 49 (2d Cir. 1972) (quotation omitted);[5] *McGowan v. Cadbury Schweppes, PLC*, 941 F. Supp. 344, 346 (S.D.N.Y. 1996) ("[T]he Second Circuit has rejected the contention that the Court can consider the relief sought from the perspective of either party or the party seeking jurisdiction when determining whether the amount in controversy requirement has been satisfied.").

---

[5] *Kheel* was decided under a prior version of the statute conferring federal-question jurisdiction that imposed a $10,000 amount-in-controversy threshold. *Id.* at 48; *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 377 (2012) ("Recognizing the responsibility of federal courts to decide claims, large or small, arising under federal law, Congress in 1980 eliminated the amount-in-controversy requirement in federal question (but not diversity) cases.").

This case does not remotely resemble one in which "the jurisdictional amount is not clearly alleged in the plaintiff's complaint, and the defendant's notice of removal fails to allege facts adequate to establish that the amount in controversy exceeds the jurisdictional amount." *Gilman*, 104 F.3d at 1428. Plaintiff's lawsuit is expressly premised upon the First Lady's indication that, unless Plaintiff complied with the terms of her demand letter concerning his allegedly defamatory remarks, she would "initiate legal action against [him] 'for over $1 Billion Dollars [sic] in damages.'" Compl. at 3, ¶ 2 (quoting the Demand Letter). In other words, as described in the Notice of Removal, "[P]laintiff admittedly filed this declaratory-judgment action to preempt [the First Lady's] filing of a defamation lawsuit against him seeking 'over $1 Billion in damages.'" NoR ¶ 16 (cleaned up, quoting Compl. at 3, ¶ 2).

As such, the "value of the underlying claim," *Rhythm of Life*, 522 F. Supp. 3d at 7, is plausibly alleged to be one billion dollars. Against this backdrop, Plaintiff's argument that his own claims are "too speculative to support subject-matter jurisdiction" with respect to the amount in controversy, Opp. at 10 (quotation omitted), defies reason. His response on this score is that "the AIC [sic] is based not on the value of [the First Lady's] claims (the breathless and publicity-seeking $1B), but on the value of [Plaintiff's] claims . . . for impairment of his past and ongoing speech rights and interests." Sur-Reply at 2.

But the "value of the . . . injury being averted" in this case is far from "pure conjecture"; instead, it has a price tag, whether or not Plaintiff is requesting damages. *Kheel*, 457 F.2d at 49.[6] Accordingly, "the basis for jurisdiction in this case is not intangible and speculative." *Moore*, 511

---

[6] This is not a case where the object of litigation is an identified *res* that takes the amount-in-controversy determination beyond the ambit of *Kheel*'s injury-avoidance standard. *Cf. Correspondent Servs. Corp. v. JVW Inv., Ltd.*, No. 99-cv-8934 (RWS), 2004 WL 2181087, at *10 (S.D.N.Y. Sept. 29, 2004), *judgment entered sub nom. Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.*, 232 F.R.D. 173 (S.D.N.Y. 2005), *and aff'd sub nom. Correspondent Servs. Corp. v. First Equities Corp. of Fla.*, 442 F.3d 767 (2d Cir. 2006).

F.2d at 1006. Plaintiff seeks a declaration that he is not liable for the allegedly defamatory statements identified in the Demand Letter. Compl. at 16–17, ¶ 29. From his "standpoint," *Kheel*, 457 F.2d at 49, that declaration is worth upwards of one billion dollars. "[T]hat [the First Lady] may not recover the minimum jurisdictional amount," let alone the full billion dollars she threatens to seek, "or that a valid defense to the claim may exist, does not show [her] bad faith or oust the jurisdiction." *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994) (cleaned up, quotation omitted).

Instead, the burden is on Plaintiff to "show to 'a legal certainty that the [First Lady] could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums.'" *Schwartz v. Hitrons Sols., Inc.*, 397 F. Supp. 3d 357, 365 (S.D.N.Y. 2019) (quoting *Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006)); *see also Moore*, 511 F.2d at 1006 ("[C]ourts should dismiss only when it is clear to a legal certainty that jurisdictional amounts cannot be met."). Referring to the First Lady's ten-figure demand as "breathless," Sur-Reply at 2, does not satisfy this standard. *See Schwartz*, 397 F. Supp. 3d at 365 ("[T]he legal impossibility of recovery must be so certain as virtually to negate the plaintiff's good faith in asserting the claim.").

With respect to his "affirmative [and] declaratory" claims under New York's anti-SLAPP law—whether framed as seeking relief in the form of a declaratory judgment, or as "potential monetary claims"—the Court agrees with Plaintiff that any such claim, on its own, would be "too speculative for any amount in controversy valuation," Opp. at 12 (quotations omitted). *See Gilman*, 104 F.3d at 1428. Indeed, neither the Complaint nor the Notice of Removal ever specifies what these claims might be worth. *See* Compl. at 16, ¶¶ 26–28 (asserting that the First Lady "is liable to [Plaintiff] for his costs and attorney's fees as well as other compensatory and punitive

damages in an amount as yet to be determined," and seeking a declaration that the First Lady "will be liable to him" in that unspecified amount, which "in all events exceed[s] the jurisdictional amount for this Court," if she "continues or advances her claims against him or initiates or commences further claims"); Sur-Reply at 3 (pointing out that the Complaint alleged only that New York's $25,000 jurisdictional threshold was satisfied). "[B]oilerplate language claiming damages, with no detailed allegations about the facts or the nature of any injuries," does not suffice to establish the requisite amount in controversy. *Vaghela-Omanoff v. Ryder Truck Rental, Inc.*, No. 19-cv-4390 (JPO), 2019 WL 2193820, at *2 (S.D.N.Y. May 21, 2019).

Plaintiff is wrong, however, that "[t]he case must be remanded on that ground alone." Opp. at 12. While "adding a non-diverse party to a case in which federal jurisdiction is predicated on diversity defeats federal jurisdiction over the entire case, . . . adding a claim seeking less than the jurisdictional amount in controversy to a diversity claim that does satisfy the amount-in-controversy requirement does not." *F5 Cap. v. Pappas*, 856 F.3d 61, 80 (2d Cir. 2017) (citing *Allapattah*, 545 U.S. at 562). Accordingly, the Court "can turn to the question whether it has a constitutional and statutory basis for exercising supplemental jurisdiction over the other claims in the action." *Id.*

The Court does have a basis to exercise supplemental jurisdiction over Plaintiff's anti-SLAPP claims. Clearly, all of Plaintiff's claims—for a declaration that he has not defamed the First Lady, Compl. at 16–17, ¶ 29, for a declaration that she will be liable under New York's anti-SLAPP law if she proceeds with litigation claiming that he has, Compl. at 17, ¶ 30, and for costs, fees, damages, and any other and further appropriate relief,[7] Compl. at 17, ¶ 31—arise from the

---

[7] As discussed further below, it is not clear that Plaintiff even seeks a present award of such costs, fees, and damages, rather than merely a declaration that these "potential monetary claims," Opp. at 12, will vest if the First Lady proceeds with her threatened action against him.

25

same common nucleus of operative fact. *Hamilton Rsrv. Bank Ltd. v. Democratic Socialist Republic of Sri Lanka*, 134 F.4th 73, 75 (2d Cir. 2025) ("The 'common nucleus of operative fact' standard is the correct standard for evaluating supplemental jurisdiction over claims under Section 1367(a)."). More specifically, all of these claims concern the same "three groups of statements challenged in the [Demand Letter]" and involve the same "[d]ispositive [d]efects" purportedly identified by Plaintiff. Compl. at 15, ¶¶ 18, 21. This means that "supplemental jurisdiction over the related claim[s] is mandatory." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 447 (2d Cir. 1998).

The Court could perhaps decline to exercise supplemental jurisdiction over the claims premised on New York's anti-SLAPP law to the extent that they "raise[] a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). *See Suffolk Cnty. Police Benevolent Ass'n v. Trotta*, No. 22-cv-05803 (JMA) (LGD), 2024 WL 3443490, at *5 (E.D.N.Y. July 17, 2024) ("Litigation of claims arising under New York's anti-SLAPP legislation would require this Court to delve into its novel and complex application, including derogation of New York common law principles and the determination of actual malice.").[8] But "the familiar factors of judicial economy, convenience, fairness, and comity," *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 81 (2d Cir. 2018); *see United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966), would not be well-served by severing those portions of this otherwise-unitary case that touch on New York's anti-SLAPP law, remanding only those portions, and retaining jurisdiction over what remains.[9]

---

[8] Unlike in *Suffolk County*, however, the Court here would not here be proceeding without an "independent[]" basis to "support supplemental jurisdiction over" Plaintiff's state-law claims, *id. See Correspondent Servs. Corp*, 442 F.3d at 769 (while "the Declaratory Judgment Act does not by itself confer subject matter jurisdiction on the federal courts[,] . . . [t]he asserted basis for jurisdiction in this case is 28 U.S.C. § 1332.").

[9] Furthermore, because neither party has briefed the possibility of partial remand, a decision by the Court to take that unduly circuitous course effectively could be made only "*sua sponte*" without "notice and an opportunity to be heard." *Catzin*, 899 F.3d at 84.

The exercise of piecemeal jurisdiction here would thwart judicial economy, fairness, and convenience by further fragmenting this case along parallel tracks. *See Reyes v. City of New York*, 141 F.4th 55, 64–65 (2d Cir.) (holding that such a course of action "would . . . unnecessarily draw on the resources of two tribunals (rather than one)," "require[e] the parties simultaneously to litigate before a state and federal court," and "require[e] duplicative factual presentations in two tribunals."), *certified question accepted*, 44 N.Y.3d 961, 267 N.E.3d 1243 (2025). Moreover, it would serve no comity interest, because the Court does not here decide any matter of state law. *Cf. id.* at 65–66 (distinguishing *Carver v. Nassau County Interim Finance Authority*, 730 F.3d 150, 154 (2d Cir. 2013), *as corrected* (Sept. 27, 2013), as having concerned a "needless" decision of state law with "existential" significance).

Indeed, the Court declines to do so precisely because Plaintiff has presented the issues in this case in a posture fraught with artificial novelty and complexity.

## II. Declaratory Judgment Act

Plaintiff seeks 1) a declaration "that the challenged statements in the [Demand] Letter are not actionable libel claims," Compl. at 16–17, ¶ 29; 2) a declaration that "if [the First Lady] continues or advances her claims against [Plaintiff] . . . she shall be liable to him" for as-yet-contingent costs, fees, and damages, Compl. at 17, ¶¶ 30(a)–(c); and 3) an award of "costs and legal fees, other compensatory damages and punitive damages together with such other and further relief the Court deems just and proper," Compl. at 17, ¶ 31. Plaintiff characterizes the latter two claims for relief as based upon a hybrid "declaratory and affirmative" theory of New York's anti-SLAPP law. Compl., Count II (cleaned up).

As already noted, it is not clear from Plaintiff's pleadings or the briefing whether he purports to seek, presently, an award of damages under New York's anti-SLAPP law, or merely a

27

declaration that he will at some point become entitled to such damages. *Compare* Compl. at 16, ¶¶ 26 ("Under the circumstances set out above, New York's anti-SLAPP law requires that Mr. Wolff be awarded costs and attorney's fees, his other compensatory damages along with punitive damages, but in all events in an amount exceeding the jurisdictional amount for this Court."), 27 (similar); *with* Compl. at 17, ¶¶ 30(a)–(c) (seeking a declaration that, "if [the First Lady] continues or advances her claims against [Plaintiff][,] . . . she shall be liable to him" for costs, fees, and damages).

To be sure, Plaintiff does insist that he presently has a cognizable "[a]ffirmative [a]nti-SLAPP" claim against the First Lady. Opp. at 12–14; *but see* Sur-Reply at 8–9 (conceding that the First Lady has not filed a complaint). The First Lady disagrees. *See* Reply at 7 ("Plaintiff [d]oes [n]ot have an '[a]ffirmative' [a]nti-SLAPP [c]laim"). But, as discussed in more detail below, this simply amounts to an argument about whether Plaintiff's anti-SLAPP claims are ripe for review.[10] *See, e.g.*, Opp. at 14 (Plaintiff's "anti-SLAPP causes of action are . . . not based on future contingencies" because "[a] claim was directed by [the Demand Letter] based on [Plaintiff's] speech in a public forum" thus "trigger[ing] the cause of action and remedies under the New York anti-SLAPP [sic]." (quotation omitted)). The Court declines to wade into the complex, choice-of-law-intensive, and potentially merits-based question presented by this line of argument; namely whether, in view of Florida procedures for litigating libel claims, *see* Fla. Stat. § 770.1, the Demand Letter constitutes a "judicial pleading or filing," NYCRL § 76-A(1)(b), sufficient to trigger New York's anti-SLAPP law, *see* Opp. at 13–14; Reply at 7, in a parallel action brought in New York and removed to federal court.[11]

---

[10] Put differently, this is a sub-species of the broader argument over whether or not Plaintiff's Complaint, as a whole, seeks an improper "advisory ruling[]." *MedImmune*, 549 U.S. at 142 (Thomas, J., dissenting).

[11] Indeed, it is not entirely clear that the Court ***could*** proceed that far, because, while the Court ultimately finds that it has jurisdiction over the subject matter of this case, it does not reach the issue of personal jurisdiction over the First

Whether or not he has an "affirmative" anti-SLAPP claim, Plaintiff is remarkably cagey with respect to his request for "an award of costs and legal fees, other compensatory damages and punitive damages together with such other and further relief the Court deems just and proper." Compl. at 17, ¶ 31. Indeed, he refers in his briefing only to his "***potential*** monetary claims," which he glibly asserts are "too speculative for any amount in controversy valuation." Opp. at 12 (emphasis added, quotations omitted). In his efforts to defeat federal jurisdiction, he further clarifies that "the speech rights" he "seeks to vindicate are intangible and declaratory, . . . not readily assayed as monetary awards might be." Sur-Reply at 2.

In view of this gamesmanship, Plaintiff's "boilerplate language claiming damages," *Vaghela-Omanoff*, 2019 WL 2193820, at *2, reads like little more than a "tactical ploy[]," *Roche Cyrulnik Freedman LLP v. Cyrulnik*, 582 F. Supp. 3d 180, 190 (S.D.N.Y. 2022), to shore up otherwise an otherwise inapposite lawsuit. But even if he were seeking a present award of damages, any such relief would necessarily "follow[] directly from [the] declaration" that he principally seeks. *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 25 (2d Cir. 1998).

Accordingly, the Court treats Plaintiff's vague, self-serving, and confused request for an unspecified sum of damages as mere boilerplate and construes the Complaint as seeking only declaratory relief. *Cf. Fox v. Bd. of Trs. of State Univ. of New York*, 42 F.3d 135, 141–42 (2d Cir. 1994) ("It thus seems apparent that defenses available to Defendants would have precluded any successful claim for money damages, nominal or otherwise, in this case. We are especially

---

Lady. *See Zeballos v. Tan*, No. 06-cv-1268 (GEL), 2006 WL 1975995, at *6 (S.D.N.Y. July 10, 2006) ("Because proper service has not been effected, the Court remains without personal jurisdiction over the defendant" and may not proceed to the merits); *but see SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 346 (2d Cir. 2018) (Calabresi, J. concurring) ("*Steel Co.* does not . . . undermine the appropriateness of our deciding the merits in the current case" because personal jurisdiction does not implicate Article III concerns).

reluctant in these circumstances to read a damages claim into the  Complaint's boilerplate prayer for 'such other relief as the Court deems just and proper,' or to conclude that the district court should have exercised its discretion to permit an amendment of the Complaint to seek nominal damages."); *Plano v. Baker*, 504 F.2d 595, 599 (2d Cir. 1974) ("Of course, a boilerplate claim for damages will not automatically render the administrative remedy inadequate.").

As brought before this Court, the pending claims for declaratory judgment are not obviously ones the Court is permitted to decide.  While the Court finds that it probably could do so, for reasons discussed below it declines to proceed to the merits.

### a.  Existence of a Case or Controversy

The Parties argue past each other with respect to the question of whether Plaintiff's Complaint presents a live case or controversy.  *Compare* Reply at 6 n.3 (According to the First Lady, Plaintiff's "[im]proper use of the declaratory-judgment cause of action" raises "not a 'justiciability' question, but a question of whether the Declaratory Judgment Act permits this type of claim."[12] (citation omitted)); *with* Sur-Reply at 7 (Nevertheless, Plaintiff points out, "the question of whether an action seeks an 'advisory opinion' is tied directly to whether the Federal Court has subject-matter jurisdiction over the case.").  Regardless of how the Parties view the implications of their own arguments, however, the Court has an independent obligation to assure itself of the existence of subject matter jurisdiction.  *See, e.g.*, *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) ("[S]ubject-matter jurisdiction must be considered by the court on its own motion, even if no party raises an objection.").

---

[12] The Court pauses to note the irony of the First Lady's choice to raise this argument in a footnote, given her contention elsewhere that arguments raised in such a manner are waived.  *See* Reply at 7 (citing *Aberdeen City Council v. Bloomberg L.P.*, 688 F. Supp. 3d 169, 183 n.8 (S.D.N.Y. 2023)).

It is beyond doubt that "[t]he [federal] Declaratory Judgment Act—not state declaratory judgment law—provides the procedural mechanism for granting declaratory relief in federal diversity cases." *Cont'l Indus. Grp., Inc. v. Altunkilic*, No. 14-cv-790 (AT) (JLC), 2020 WL 3884312, at *10 (S.D.N.Y. July 1, 2020); *see also Parker v. Citizen's Bank, N.A.*, No. 19-cv-1454 (VEC), 2019 WL 5569680, at *4 n.7 (S.D.N.Y. Oct. 29, 2019) (same) (citing *Wilton*, 515 U.S. at 287; *American Standard, Inc. v. Oakfabco, Inc.*, 498 F. Supp. 2d 711, 715 (S.D.N.Y. 2007)); *Haller v. Usman*, No. 24-cv-977 (KPF), 2025 WL 605572, at *9 (S.D.N.Y. Feb. 25, 2025) (same). Accordingly, the Court need not address Plaintiff's repeated suggestion that "[t]he Complaint allege[s] a justiciable controversy under New York C.P.L.R. § 3001." Opp. at 10; Sur-Reply at 7, 7 n.8, 8 n.11.

"[T]he phrase 'case of actual controversy' in the [Declaratory Judgment] Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune*, 549 U.S. at 127. In general, "[t]o establish Article III standing, a plaintiff must . . . allege . . . that he has suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant, and which is likely to be redressed by the requested relief." *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003). "Declaratory judgment actions," however, "raise special standing concerns." *Jenkins v. United States*, 386 F.3d 415, 417 (2d Cir. 2004).

In this context, "[t]he disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Id.* at 417–18. "The standard for ripeness in a declaratory judgment action is that 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Duane Reade, Inc. v. St. Paul Fire*

*& Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

Here, Plaintiff seeks a declaration "that the challenged statements in the [Demand] Letter are not actionable libel claims," Compl. at 16–17, ¶ 29, and, further, that the hypothetical assertion of such claims by the First Lady in court would violate—or, perhaps, has violated already—New York's anti-SLAPP law, entitling him to costs, fees, and damages, Compl. at 17, ¶¶ 30–31.

The parties vigorously dispute the temporal orientation of this relief.[13]  According to the First Lady, "Plaintiff's attempt to obtain a preemptive declaration that he is not liable to Mrs. Trump for his past defamatory statements is an abuse of the declaratory-judgment mechanism." MTD at 2.  But Plaintiff vociferously maintains that he is suing over an attempt to "chill, intimidate, and silence . . . not just past speech, but, significantly, *future* speech."  Opp. at 11 (citing Compl. at 5, ¶ 9); *see also* Sur-Reply at 8 (The challenged statements that constitute the "zone of inquiry" are "exactly what [Plaintiff] has been and continues to be investigating and reporting on.").

It is true that "declaratory relief is intended to operate prospectively."  *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Int'l Wire Grp., Inc.*, No. 02-cv-10338 (SAS), 2003 WL 21277114, at *5 (S.D.N.Y. June 2, 2003).  Nevertheless, in emphasizing the prospective axis of his claims, Plaintiff overlooks important nuances in Article III.  This case does not concern "unaccrued or undefined rights or obligations arising under *contractual* relations such as insurance and intellectual property."  *Id.* (emphasis added) (quoting *Dow Jones & Co. v. Harrods, Ltd.*, 237 F.

---

[13] One permutation of the Parties' central argument turns on the question of whether the Demand Letter triggered the anti-SLAPP statute.  *See* MTD at 9; *see also* Opp. at 12–14; Reply at 7; Sur-Reply at 8–9.  As noted, the Court does not reach that potentially merits-based dispute.  Whether or not the First Lady's defamation claims have been formally asserted in a judicial filing does not affect the Court's view of the existence of a case or controversy.

Supp. 2d 394, 426 (S.D.N.Y. 2002), *aff'd*, 346 F.3d 357 (2d Cir. 2003)); *cf. MedImmune*, 549 U.S. at 137 (concerning a patent licensing agreement).

Instead, it concerns a dispute over whether potential tort liability exists based on Plaintiff's speech.  Of course, this poses no Article III problem "where threatened action by ***government*** is concerned." *MedImmune*, 549 U.S. at 128–29.  But nothing in what "could be described as" the *MedImmune* Court's "extension" of that principle "to private litigation" involving "voluntarily accepted contractual obligations," *MedImmune*, 549 U.S. at 134 n.12 (quoting *id.* at 145 (Thomas, J., dissenting)), suggests that Article III confers jurisdiction on the federal courts to conduct pre-publication review of potentially defamatory statements made by and about private parties.

Happily, the Court need not decide anything here about the outer bounds of the principle that a declaratory judgment plaintiff is "not required, insofar as Article III is concerned, to" breach his legal obligations "before seeking a declaratory judgment in federal court."  *MedImmune*, 549 U.S. at 137.  There is no need for Plaintiff to continue making the challenged statements about the First Lady to find out whether she thinks they are tortious:  She clearly does.  *See* Demand Letter at 19[14] (characterizing the statements as "false, defamatory, disparaging, and inflammatory").

Because "the parties have a concrete disagreement about whether the disputed conduct [is] tortious, and . . . a tort suit" has already been threatened and "would likely follow if the alleged tort were committed" again, Restatement (Third) of Torts: Remedies § 60 TD No 3 (2024), there is nothing particularly speculative about the controversy this case presents.  Indeed, while the Court has its doubts, it is not inconceivable that "the federal courts [could] entertain a claim that a defamation plaintiff violated the substantive [dimension of New York's anti-SLAPP] law by

---

[14] Because the Demand Letter is not separately paginated, and because of the manner in which the Demand Letter was attached to the Complaint, and, in turn, the NoR, the Court refers here to the ECF-stamped pagination that spans both the Complaint and the Demand Letter.

commencing a defamation lawsuit in state court based on statements made in connection with an issue of public interest without a substantial basis in fact and law." *Max v. Lissner*, No. 22-cv-5070 (VEC), 2023 WL 2346365, at *8 (S.D.N.Y. Mar. 3, 2023).

That Plaintiff seeks declaratory relief on the basis of statements already made and challenged supports the existence of jurisdiction. But those statements are being challenged in a different state, under a different state's law. In a circumstance like this one, the Court must consider carefully whether it would be prudent to pontificate on the merits. This Court firmly believes that it would not be prudent to do so.

### b. Discretion to Exercise Jurisdiction

The Declaratory Judgment Act, which extends "an opportunity, rather than a duty, to grant a new form of relief," "confers a discretion on the courts rather than an absolute right upon the litigant." *Wilton*, 515 U.S. at 287–88 (1995). Courts are accordingly entitled "to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." *Dow Jones*, 346 F.3d at 359. Indeed, "[e]ven where an actual controversy has been established, a court must still decide whether it will exercise its discretion to entertain a request for declaratory judgment." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 311 (S.D.N.Y. 2010). In other words, that the Court "***has*** jurisdiction to declare" the Parties' legal situation does not mean that it must "***exercise*** [this] jurisdiction." *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 96 (2d Cir. 2023).

Both Parties, perhaps tactically, overlook the reality that this is not a zero-sum game. For their own reasons, neither asks the Court to abstain. The First Lady argues that Plaintiff's abuse of the declaratory judgment mechanism is a merits issue, entitling her to a dismissal with prejudice. MTD at 12 ("[T]he complaint also should be dismissed for failure to state a claim upon which

relief can be granted."). Plaintiff responds that, if her removal to federal court has rendered his claim for declaratory relief improper, the Court lacks subject matter jurisdiction and must remand. Opp. at 9–10. Both are wrong.

As already noted, the First Lady maintains in a rather tentative footnote that Plaintiff's gamesmanship poses not a "'justiciability' question, but a question of whether the Declaratory Judgment Act permits this type of claim." Reply at 6 n.3 (citations omitted) (referring *to John John Wiley & Sons, Inc. v. Visuals Unlimited, Inc.*, No. 11-cv-5453-CM, 2011 WL 5245192, at *4 (S.D.N.Y. Nov. 2, 2011); *Honeywell Int'l Inc. v. Ecoer Inc.*, No. 24-cv-1464 (PAE), 2024 WL 3521591, at *8–9 (S.D.N.Y. July 23, 2024); *Tang Cap. Partners, LP. v. BRC Inc.*, 661 F. Supp. 3d 48, 78 (S.D.N.Y. 2023). But the Declaratory Judgment Act "does not create an independent cause of action." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012). Accordingly, the "type of claim" it "permits," Reply at 6 n.3, is one that is legally cognizable as premised upon "a valid legal predicate" of substantive law. *Naranjo*, 667 F.3d at 244; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Karp*, 108 F.3d 17, 21 (2d Cir. 1997) ("The [Declaratory Judgment Act] is procedural in nature, and merely offers an ***additional remedy*** to litigants."). Such a claim must also be justiciable. *Maryland Cas.*, 312 U.S. at 273 (requiring "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.").

The Court here does not pass upon the substantive validity of Plaintiff's claims. Indeed, as discussed further below, those "claims" are really defenses and counterclaims, which should be resolved in a posture that presents them accordingly. That is the sole basis of the Court's decision

here.  Recognizing the existence of a case or controversy between the Parties, the Court merely—and specifically—declines to adjudicate the merits.[15]

Plaintiff, while correct that the gamesmanship identified by the First Lady is not based in the merits, is wrong to conceive of it as a trap door back to state court.  *See* Opp. at 9–10; Sur-Reply at 6–7.  This line of argument appears to be animated by his assumption that he will find in the state court an audience more receptive to his strained requests.  *See* Sur-Reply at 8 n. 11 ("New York's §3001 will show even greater receptivity to Dec [sic] actions brought ***before*** any breach or violation has occurred.  Thus, declaratory judgment is not precluded just because it involves a future event." (quotations and citations omitted)).

It is "well-settled that where 'the federal court ***never could have exercised original jurisdiction*** over the case, remand is required.'"  *Zanotti v. Invention Submission Corp.*, No. 18-cv-5893 (NSR), 2020 WL 2857304, at *11 (S.D.N.Y. June 2, 2020) (cleaned up, emphasis added) (quoting *Mignogna v. Sair Aviation, Inc.*, 937 F.2d 37, 40 (2d Cir. 1991)); *see also* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").  But, where a federal court could have exercised original jurisdiction—as the Court has explicitly found it could do here—there is no reason for remand.  *Cf. Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir. 1988) ("Where the state claims

---

[15] The First Lady cites to district court opinions in which the discretionary decision not "to exercise . . . permissive jurisdiction," *John Wiley & Sons*, 2011 WL 5245192, at *4, was made under the aegis of Rule 12(b)(6).  *See* Opp. at 6; *John Wiley & Sons*, 2011 WL 5245192, at *4; *Honeywell*, 2024 WL 3521591, at *8 ("The Court declines to exercise jurisdiction over defendants' claims for declaratory relief for two reasons."); *Tang*, 661 F. Supp. 3d at 76 (S.D.N.Y. 2023) ("The Act confers a discretion on the courts rather than an absolute right upon the litigant." (quotation omitted)).  Those citations, however, do not alter the reality that such a declination occurs at the threshold of a case, before the merits have been reached.  *See Ruhrgas*, 526 U.S. at 585 (noting that "[i]t is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits," including by, for example, "abstain[ing] under *Younger* without deciding whether the parties present a case or controversy." (citation omitted)); *see also Parker*, 2019 WL 5569680, at *5 ("Although it is conceivable that the alleged events could give rise to a direct ADA claim, they are not an appropriate basis for a [declaratory judgment] action." (citing, *inter alia*, *John Wiley & Sons*, 2011 WL 5245192, at *4; *Nat'l Union Fire*, 2003 WL 21277114, at *5, in declining to exercise jurisdiction)).

originally reached the federal forum by removal from a state court, the district court has the discretion to dismiss the claims without prejudice or remand them to the state court."); *see also C Fink Fam. Tr. ex rel. Landau v. American Gen. Life Ins. Co.*, No. 10-cv-9230 (JSR), 2011 WL 1453793, at *3 (S.D.N.Y. Apr. 7, 2011) (rejecting, in a declaratory judgment action removed on the basis of diversity jurisdiction, plaintiff's argument that, "if this Court chooses to abstain from exercising jurisdiction over this matter, . . . the appropriate procedure would be to remand the action to the Supreme Court of New York" (cleaned up)).  That Plaintiff originally sued in state court, and seems to think his claims would succeed there, changes nothing; the scope of New York's declaratory judgment statute and standing law is not relevant here.  *Haagen-Dazs Shoppe Co. v. Born*, 897 F. Supp. 122, 126 (S.D.N.Y. 1995).  ("Because the Declaratory Judgment Act is procedural, *Wilton* and *Brillhart* apply with full force in this removal action premised on diversity of citizenship." (footnote omitted)).

For the reasons discussed below, the Court neither decides this case on the merits, nor dismisses for lack of subject matter jurisdiction.  Instead, it abstains under *Wilton*.

Of course, "*Wilton* does not apply where . . . a plaintiff does not seek purely declaratory relief, but also . . . seeks damages caused by the defendant's conduct."  *Kanciper*, 722 F.3d at 93 (quoting *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 106 (2d Cir. 2012)).  As discussed, the Court understands Plaintiff's Complaint here to seek purely declaratory relief.  That much is beyond further discussion with respect to Count I, which seeks a declaration of non-defamation.  Compl., Count I.

And, even if the Court were to credit the vague, self-serving, and confused boilerplate of "affirmative" portion of Count II as a request for some unspecified sum of anti-SLAPP damages, *Wilton* would remain applicable.  As other courts in this District have recognized, and the Second

Circuit tacitly affirmed, "[t]here is a limited exception to *Kanciper* where the plaintiff's purported damages claims are, in substance, wholly derivative of the requested declaratory relief." *Buss ChemTech AG v. PCS Phosphate Co., Inc.*, No. 25-cv-3710 (JGK), 2026 WL 35380, at *3 (S.D.N.Y. Jan. 6, 2026) (citing *Cyrulnik*, 582 F. Supp. 3d at 190); *see also Gen. Star Int'l Indem. Ltd. v. Chase Manhattan Bank*, No. 01-cv-11379 AGS, 2002 WL 850012, at *5 (S.D.N.Y. May 3, 2002) ("While this Court believes that it is entitled to exercise a greater level of discretion by virtue of the fact that virtually all claims stem from the underlying request for declaratory relief, it has determined that [defendant's] motion should be granted even under the stricter *Colorado River* standard."), *aff'd*, 57 F. App'x 892 (2d Cir. 2003).

If it applies anywhere, that exception to *Kanciper* must apply here. By his own allegations, Plaintiff "is entitled to a Declaratory Judgment on all the claims related to or referenced in the [Demand] Letter and to a Monetary Judgment under" New York's anti-SLAPP law for a single set of reasons. Compl. at 5, ¶ 9; *see also* Compl. at 14–16, ¶¶ 14–28. As he views them, the statements in question "all engage issues of public interest," and the claims threatened in the Demand Letter "are made without a substantial basis in fact and law" and "for the purpose of harassing, intimidating, punishing, or otherwise maliciously inhibiting" his speech. *Id.* In other words, Plaintiff's "potential" claim for damages, Opp. at 12, is really just a request for a declaration that he may become—or, perhaps, already is—entitled to them. Compl. at 17, ¶¶ 30–31.

Indeed, to the extent that Plaintiff could be understood to seek both a declaration and damages, it appears that he does so only as a merits-based hedge against his own procedural gamble. On the one hand, he seeks "a declaration "that *if* [the First Lady] continues or advances her claims . . . she will be liable" to him for damages under New York's anti-SLAPP law. Compl. at 16, ¶ 28 (emphasis added); *see also* Compl. at 17, ¶ 30 (same). On the other hand, in case he

38

has happened upon a court willing to agree, he insists that the First Lady "is liable" now, albeit "in an amount as yet to be determined." Compl. at 16, ¶ 27; *see also* Compl. at 17, ¶ 31.

New York's anti-SLAPP law is triggered by a "lawsuit, cause of action, cross-claim, counterclaim, or other judicial pleading or filing requesting relief." NYCRL § 76-A(1)(b). But he filed this preemptive, reactionary lawsuit in response to the Demand Letter.[16] Plaintiff insists, when it suits him, that the Demand letter "triggers the cause of action and remedies under the New York anti-SLAPP [sic]." Opp. at 14. Out of the other side of his mouth, he concedes that his "monetary claims" remain "potential." Opp. at 12. In essence, he asks for a declaration that the claims threatened in the Demand Letter will result in anti-SLAPP liability *if* they are pursued; and, should the Court agree with him on the merits that the Demand Letter was actually a "claim" in itself, *see* Compl. at 15, ¶ 19, he would also be happy to accept damages now.

The Court need not go there. Any such award of damages would necessarily be "contingent upon a threshold finding that" the claims outlined in the Demand Letter exceed the bounds of New York's anti-SLAPP law. *Gen. Star*, 2002 WL 850012, at *5. This is a declaratory judgment action, and *Wilton* abstention remains an option the Court may consider.

> In applying *Wilton*, courts in this circuit consider the following factors:
>
> (1) whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether such a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a better or more effective remedy; and (6) whether

---

[16] As noted, the Parties dispute this issue vigorously, but their arguments do not focus on the propriety of *Wilton* abstention. Instead, they focus on whether it would constitute "an improper advisory opinion" for the Court to provide "an advance ruling that [the First Lady's] **potential** but unasserted defamation claims" will incur anti-SLAPP liability if pursued. MTD at 14; *see also* Opp. at 12–14; Reply at 7; *but see* Sur-Reply at 8–9 (conceding that the First Lady has not filed a complaint).

concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction.

*Admiral Ins. Co.*, 57 F.4th at 99–100 (cleaned up, quotations and citations omitted).

The Court need not consider all of these factors in conducting its analysis. *Starr Indem. & Liab. Co. v. Exist, Inc.*, No. 23-912, 2024 WL 503729, at *2 (2d Cir. Feb. 9, 2024) ("Although the district court did not consider three of the *Admiral Insurance* factors, it acted within its discretion in doing so because the omitted factors are either irrelevant or deserve less than 'significant weight' in this case."). Nevertheless, the Court has here endeavored to consider every factor, as it would guideposts along the analytical way.

The Court begins with an established norm: When a plaintiff seeks declaratory relief concerning his past torts, courts generally decline to exercise their jurisdiction over his claim. *See, e.g.*, *Honeywell*, 2024 WL 3521591, at *8 ("[D]efendants' claims improperly seek declarations about past conduct only."); *Tang*, 661 F. Supp. 3d at 78 ("Declaratory judgments may provide relief from uncertainty when they are directed towards prospective relief, but declaratory judgments resolving disputes over past acts are inappropriate."); *Parker*, 2019 WL 5569680, at *3 ("A court has discretion to decide whether to declare a plaintiff's rights as a litigant. Here, the Court chooses not to do so" because "Plaintiff's claim is based on past harms only."); *John Wiley & Sons*, 2011 WL 5245192, at *4 ("[T]he [Declaratory Judgment Act] is not intended to be used by parties who seek a declaration of non-liability to preemptively defeat tort claims already accrued by past wrongful conduct."); *Nat'l Union Fire*, 2003 WL 21277114, at *5 ("[D]eclaratory relief is intended to operate prospectively. There is no basis for declaratory relief where only past acts are involved.").

Plaintiff here asks the Court to bless as non-tortious certain public statements he has previously made about the First Lady. *See* Compl. at 8–14 (identifying eleven statements and

40

cataloguing various "defects" in in any claim that they are defamatory).  This is an abuse of the Declaratory Judgment Act.  It is true that "[t]he fundamental purpose of the [Declaratory Judgment Act] is to 'avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued.'" *Nat'l Union Fire*, 2003 WL 21277114, at *4 (quoting *Luckenbach Steamship Co. v. United States*, 312 F.2d 545, 548 (2d Cir. 1963).  Nevertheless, it remains the case that, "where the purported use of the [Declaratory Judgment Act] seeks a declaration of non-liability to preemptively defeat actions grounded on tort claims involving rights already accrued by reason of alleged wrongful conduct, various courts have held that [such an] application is not a warranted purpose of the [Declaratory Judgment Act]."  *Dow Jones*, 237 F. Supp. 2d at 426.

"[T]o allow a declaratory judgment action under the facts before us would be to allow a substitute for the traditional procedures for adjudicating" speech-tort cases between private parties. *John Wiley & Sons*, 2011 WL 5245192, at *4 (quotation omitted).  More specifically, to entertain this case would reward Plaintiff's brazen attempt to "short-circuit" a suit by the First Lady in Florida, conferring upon him an undue "procedural advantage" by allowing him to "preempt the forum choice of the plaintiff to the coercive action."  *Nat'l Union Fire*, 2003 WL 21277114, at *6.

This is textbook bad-faith forum-shopping, in which Plaintiff asks the Court to collude by "exercis[ing] jurisdiction over [a] declaratory action[] motivated by a desire to wrest the choice of forum from the real plaintiff."  *Id.*  Plaintiff may or may not have defenses to the First Lady's would-be claim of defamation.  Indeed, he may or may not have—or come to have—anti-SLAPP claims of his own.  The Court takes no position on these possibilities.  The Parties are free to pursue in good faith whatever claims they wish.  But it is disingenuous for Plaintiff to assert that he had "no choice" but to preemptively file this action in New York.  Compl. at 4, ¶ 6.

Particularly where, as here, "the filing of a declaratory judgment action is triggered by a notice letter," the Court "presume[s]" "[a]nticipatory conduct." *Nat'l Union Fire*, 2003 WL 21277114, at *5 (quotation omitted). And such conduct "is an 'equitable consideration' that may 'factor in the decision to allow the later filed action to proceed to judgment in the plaintiffs' chosen forum.'" *Id.* (quoting *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 219 (2d Cir. 1978), *rev'd on other grounds*, 652 F.2d 278 (2d Cir. 1981)); *see also Freeman v. Giuliani*, No. 24-civ-06563 (LJL), 2024 WL 5239410, at *15 (S.D.N.Y. Dec. 27, 2024) ("*Wilton*'s purpose is to discourage a federal declaratory judgment from interfering with a current or perhaps a potential and imminent state proceeding."). Plaintiff's apparent victory in the race to the courthouse does not retroactively mitigate his blatant forum-shopping. *Dow Jones*, 237 F. Supp. 2d at 443 ("*Wilton* may be read to instruct that there can be no mechanistic accrual of rights that attaches by reason of reaching the courthouse first, or indeed of engaging in a race at all.").

Compounding this problem is Plaintiff's contention that the First Lady's coercive action is, "[f]or all intents and purposes," **already pending** in Florida. Compl. at 8, ¶ 7; *see also* Opp. at 13–14. The Court need not decide whether this is true as a matter of law. The fact that Plaintiff makes the argument is enough to underscore the gamesmanship that animates his litigation tactics. His declaratory judgment action amounts to nothing more than "procedural fencing" or a "race to res judicata." *Admiral Ins. Co.*, 57 F.4th at 100. The Court will not facilitate this. There is no reason whatsoever that Plaintiff should be allowed to "rely solely on [the] past injuries" purportedly caused by the assertion of claims against him in Florida "to obtain declaratory relief" thwarting those claims in a parallel action here. *Parker*, 2019 WL 5569680, at *5.

The Court does note that Plaintiff makes much of the "chilling impact" one might experience upon being sued for defamation. Sur-Reply at 10; *see also* Opp. at 11; Sur-Reply at 8–

9. In other words, he contends that his claim concerns "not just past speech, but, significantly, *future* speech." Opp. at 11; *see also* Compl. at 5, ¶ 9 ("[S]ignificantly, the claims impede and chill future reporting and writing that Mr. Wolff has committed to doing . . . ."). But, fundamentally, he is asking the Court to adjudicate the tortiousness of specific statements that he has already made, and to do so in a forum other than the one in which litigation is already threatened (or, perhaps, pending). That he apparently wants to repeat those statements does not entitle him to "short-circuit" the Florida lawsuit here.[17] *Nat'l Union Fire*, 2003 WL 21277114, at *6.

The Court's assessment of Plaintiff's gamesmanship bottoms out into recognition that he should simply seek the "adequate remedy" available to him by the assertion of his defenses and counterclaims in the action that he argues is pending "between the same parties" in Florida, where "all of the same issues raised in the declaratory judgment action are also in dispute." *John Wiley & Sons*, 2011 WL 5245192, at *9 (quoting *Dow Jones*, 237 F. Supp. 2d at 442). The coercive action in Florida may already be "pending" or it may merely be "potential." *Freeman*, 2024 WL 5239410, at *13 (discussing a lack of clarity in Second Circuit caselaw regarding whether "the existence of a pending or at least threatened state court proceeding is a prerequisite to *Wilton* abstention"). Either way, it is clearly relevant to the question of "whether there is a better or more effective remedy," *Admiral Ins. Co.*, 57 F.4th at 100, available for the resolution of this case.

It does not trouble the Court that a defensive proceeding in Florida may not afford him "an opportunity for ventilation of the same state law issues," *Wilton*, 515 U.S. at 283, as would an offensive one in New York. All that might be missing in Florida—depending on a choice-of-law

---

[17] If he means, by contrast, to ask the Court to review statements he has never before made, the Court declines to offer its assistance. Indeed, as discussed, the Court seriously doubts that it would have jurisdiction to issue an opinion staking out for him the boundaries within which any such statements would be immunized from future litigation. *See MedImmune*, 549 U.S. at 142 (Thomas, J., dissenting) ("[Plaintiff's] prayer for declaratory relief can be reasonably understood only as seeking an advisory opinion about an affirmative defense it might use in some future litigation.").

inquiry the Court does not endeavor here to undertake—are "the more protective policies" reflected in New York's anti-SLAPP law. Sur-Reply at 8 n.10. This merely confirms the obvious reality, already discussed, that Plaintiff's action here constitutes an improper "rush to file first in anticipation of litigation in another tribunal, thereby enabling [him] to choose the forum and governing law by which to adjudicate the dispute, and otherwise to interfere with or frustrate the [First Lady's] pursuit of claims elsewhere." *Dow Jones*, 237 F. Supp. 2d at 440 (citing *Factors*, 579 F.2d at 219).

Relatedly, "the use of a declaratory judgment would increase friction between sovereign legal systems [and] improperly encroach on the domain of a state . . . court," undermine "judicial efficiency and . . . economy," and potentially still fail to "clarify[]," "settl[e]," and "finalize" the controversy. *Admiral Ins. Co.*, 57 F.4th at 99–100 (quotation omitted). In struggling against the First Lady's right to select a forum for her coercive action in the first instance, and her right to remove to a federal one in the second, Plaintiff has brought this case to the Court in a posture of profound confusion.

He asks a federal court to interpose "the more protective policies of New York State and its own Constitutional protections of free speech" as reflected in New York's anti-SLAPP law, Sur-Reply at 8 n.10, in a simulated adjudication of a would-be Florida-based defamation suit. Faced with this procedurally convoluted request, the Court declines to multiply "[t]he risk of potentially contradictory fact finding between the state and federal court[s] on [the] critical issue" of the truth or falsity of Plaintiff's statements about the First Lady. *Stoncor Grp., Inc. v. Peerless Ins. Co.*, 322 F. Supp. 3d 505, 517 (S.D.N.Y. 2018). Nor will it gratuitously volunteer to generate a "needless" decision on the scope of New York's anti-SLAPP law. *Cf. Reyes*, 141 F.4th at 65. To reach the merits here would be an abuse of the judicial system and a waste of its resources.

44

The First Lady was entitled to have Plaintiff's action against her heard by a federal court according to federal procedures.  That action does concern a live case or controversy, but it is one that should be litigated according to the "traditional procedures for adjudicating" speech-tort cases between private parties.  *John Wiley & Sons*, 2011 WL 5245192, at *4.  Accordingly, it should not be litigated here.

### CONCLUSION

Because this case presents a real dispute—one between citizens of different states—this Court has subject matter jurisdiction.  The Court, however, declines to exercise that jurisdiction. Instead, based on prudential abstention, it dismisses this case to be litigated like any other.

**SO ORDERED:**

**DATED: May 22, 2026**
     **New York, New York**

**Mary Kay Vyskocil**
**United States District Judge**

45